326    APPELLATE COURTS OF ILLINOIS.

McGilton v. St. Louis National Stock Yards, 165 Ill. App. 326.

---

## C. E. McGilton et al., Appellants, v. St. Louis National Stock Yards, Appellee.

ANIMALS—*when recovery cannot be had for injury to.* If a person employed to disinfect animals makes an honest effort so to do and to comply strictly with the government regulations, no recovery can be had for an injury resulting from the effort so to disinfect the animals in the absence of a showing that ordinary care was not exercised.

Action in case. Appeal from the Circuit Court of St. Clair county; the Hon. GEORGE A. CROW, Judge, presiding. Heard in this court at the October term, 1910. Affirmed. Opinion filed November 11, 1911.

**Statement by the Court.** This action is in case and was brought by appellants against appellee for negligently killing seventy-seven young horses of appellants, and for damages to thirteen others that had been shipped to East St. Louis from Texas. Judgment was entered in favor of appellee against appellants upon a verdict of not guilty by a jury, in pursuance of a peremptory instruction by the court at the conclusion of all the evidence. McGilton and Horn, who were partners, have appealed to this court.

The uncontroverted evidence in the record shows the following facts: That appellants were engaged in buying horses that came into the yards for sale to local customers; that appellee was engaged in doing a general stock yards business and was possessed of yards, pens, sheds, barns and other equipments necessary for doing a general stock yards business near

East St. Louis; that it handled cattle and horses from the quarantine districts of the South and West, some of which were infested with the southern cattle tick, called *margaropus annulatus,* which is supposed to disseminate Texas or splenetic fever; that it provided a dipping vat in which cattle and horses from the quarantine districts, which were infested with the tick, might be dipped; that this dipping vat consisted of a pit about forty feet long, three feet wide and ten feet deep, and filled with crude oil to the depth of six feet; that at the entrance to the vat there was a small pen with a chute leading to the vat, and at the end of the chute over the vat was a heavy plank balanced on a pivot from which the animals were thrown into the vat of oil when tilted by their weight; that this vat was built by appellee in 1908, in accordance with plans given it by the Government inspector located at East St. Louis, and was kept filled with crude oil purchased from the oil fields at Chanute, Kansas, on the recommendation of said inspector, and for the purpose of dipping tick infested cattle and horses; that appellee had frequently dipped cattle in this oil without injury to them, prior to the dipping of appellant's horses, and two horses had been dipped prior thereto without injury; that on June 28, 1909, appellants bought said horses in good health and flesh at the stock yards of Campbell-Reid & Western Sale Stables Company; that they were quarantined at the time they were bought and the announcement was made in hearing of appellants that they were "tick horses," and that the government required that they be dipped, if purchased, and appellants knew the horses would have to be dipped before the government would allow them moved; that after the purchase Mr. McGilton, one of the appellants, tried several times to get the horses released without being dipped, but Dr. Clancy, the government inspector, refused to release them without being dipped; that appellants then arranged with appellee to dip the horses at fifty cents per head,

328    APPELLATE COURTS OF ILLINOIS.

McGilton v. St. Louis National Stock Yards, 165 Ill. App. 326.

and on July 3, 1909, they were dipped and again locked up in appellee's sheds to await the results and ascertain if the ticks were killed, the killing of the ticks being the purpose of the dipping; that they were dipped under the supervision of the government's inspectors, the requirements being that every horse be completely submerged in the oil, and that oil be poured on the uncovered spots of those that were not completely submerged; that within a few days the hair on all the horses came off, their hides began to dry and became sore and cracked open, and within a month or so all but thirteen of them had sickened and died and the remaining thirteen were seriously damaged.

The declaration charges that the U. S. Government inspector, acting for the Bureau of Animal Industry of the U. S. Department of Agriculture, found said horses to be affected with a kind of tick that might cause them to communicate disease to other horses, and that under the rules of the U. S. Department of Agriculture controlling the Bureau of Animal Industry, appellants were required by appellee to cause said horses to be dipped in some solution that would destroy said tick; avers that appellants employed appellee to dip said horses, and that appellee negligently dipped them in a vat containing some solution unknown to appellants, and of such a character as to eat and destroy the hair and hides of said horses and to kill them.

W. E. KNOWLES and D. J. SULLIVAN, for appellants.

M. W. BORDERS and DAN McGLYNN, for appellee.

PER CURIAM. Some questions relative to the admissibility of evidence are argued by appellants in their brief; but the only question necessary for us to consider, in our view of the case, is, does the evidence in this record fairly tend to prove that appellee was negligent in using the Chanute crude oil for the

dipping of appellants' horses? The evidence does not sustain appellants' contention that appellee required of them that they have the horses dipped in the crude oil, or otherwise dipped. The exact situation was that the government inspector would not suffer the horses to be moved from the quarantine pens or stables until they were freed from the dangerous tick with which they were infested, because it would endanger other horses with which they might come in contact. The appellee could not afford to release the horses to appellants in violation of the quarantine regulations, and would not do so without consent of the government inspector. Appellee was entirely justified in this position. In fact it could not legally do otherwise. To do otherwise it would have assumed the responsibility, and would have incurred the penalties of violating the quarantine regulations of the government. Appellants had horses infested with the dangerous tick. They were quarantined for that reason. It was up to appellants to rid the horses of this pest and kill the ticks. The vats of appellee were there and had been successfully used on cattle and two other horses prior to that time. The inspector was willing to permit them to be dipped, and to personally inspect the dipping to see that it was thoroughly done. Appellants not being able to get them released without dipping, or without removing and destroying the ticks in some other way, employed the appellee to dip them, and the inspector was present at the dipping, and saw that it was thoroughly done. They were then again put into the sheds and locked up to await results; and when it was determined that the horses were free from the ticks some ten or more days thereafter, they were released and by appellants taken to a pasture, those that were not dead. Appellee alleges that under the rules and regulations promulgated by James Wilson, Secretary of Agriculture, effective April 1, 1909, in pursuance of an Act of Congress, it was not permitted

330    APPELLATE COURTS OF ILLINOIS.

McGilton v. St. Louis National Stock Yards, 165 Ill. App. 326.

to load out said horses for shipment until after they had been dipped in a manner approved by the Secretary of Agriculture, under the supervision of an inspector of the Bureau of Animal Industry. The following parts of said regulations were introduced in evidence, to wit:

"Regulation 17. At any time of the year cattle of the quarantined area or other cattle exposed to or infested with ticks (Margaropus annulatus), which have been properly dipped in Beaumont crude petroleum or otherwise treated in a manner approved by the Secretary of Agriculture, under the supervision of an inspector of the Bureau of Animal Industry, and which have been examined and certified by the said inspector to be free of infection, may be shipped interstate, subject only to such restrictions as may be imposed by State, Territorial or District officers at points of destination. Provided, that when cattle are to be dipped, as specified herein, they shall, within six hours immediately prior to dipping, be given an opportunity to drink sufficient water to quench their thirst. Shipments of cattle that have been dipped or treated as herein provided shall be forwarded in clean, disinfected cars, shall be accompanied by the certificates of dipping or treatment issued by the inspector supervising the same, and shall not be driven through the quarantined area or be unloaded therein, except as to such points as may be designated in the rules of the Secretary of Agriculture.

"The interstate movement of horses and mules infested with ticks (Margaropus annulatus) may be made only in accordance with the regulations and rule governing the interstate movement of tick-infested cattle."

CRUDE OIL FOR DIPPING CATTLE.

"Inspectors having charge of official dipping of cattle may, upon request of the owner, permit the use of crude petroleum which does not strictly conform to the specifications of the department with respect to boiling point, gravity and sulphur content. In such cases it must be explained to the owner that the de-

partment, as in all other cases, assumes no responsibility for the effect of such oils upon the cattle or upon the disease. If such dippings are carried out, the cattle should not be passed by the inspector until he has assured himself that the treatment is efficacious. In addition the inspector should forward a quart of the oil used to the Biochemic Division, Bureau of Animal Industry, U. S. Department of Agriculture, Washington, D. C., together with a report showing the effect of the oil on the cattle and on the ticks or scab mites, as the case may be."

It is urged by appellants that the government did not recommend Chanute crude oil for the dipping of horses, and that appellee was in no wise warranted by the government regulations in the use of the oil in question, and that therefore it was negligent in using such oil without gaining a knowledge of its effects upon horses. The regulations, however, do approve of the use of "Beaumont crude petroleum," and "crude petroleum which does not strictly conform to the specifications of the department," upon request of the owner. As has been set forth in the statement, it is also true that appellee consulted the government inspector, and bought and used the very crude oil recommended by the inspector. In other words, the appellee used all reasonable means at its hands to ascertain and build the proper vat for dipping and bought what was recommended to it as the proper crude oil to put in the vat. The source of information was from the very man supposed to know what oil was proper, the man appointed by the government for the purpose of inspecting horses and superintending the dipping of them when it was done. The evidence does not show that there was any other source of knowledge at hand, or that was obtainable at that time elsewhere. The business of dipping horses in crude oil or in other solutions for the purpose of destroying the tick, so far as this evidence shows, was entirely new. The appellee was not shown to have

332 APPELLATE COURTS OF ILLINOIS.

McGilton v. St. Louis National Stock Yards, 165 Ill. App. 326.

any knowledge of any bad effects of this oil on horses. It had been recommended by the inspector for horses and cattle. It had proven to be a success on cattle, and without bad or dangerous results. So it had been used with no bad results on two horses prior thereto. In other words, the evidence fails to show negligence of this appellee in the use of this particular oil; and it cannot be presumed from the mere fact that the horses were injured by the use of the oil. It is very unfortunate that appellants must lose the $2,512.50 paid for these horses, and the heavy expenses they were out in feeding and caring for them while sick. On the other hand it was the duty of appellee in the handling of horses, cattle or other animals to comply with the requirements of the Bureau of Animal Industry, or suffer the penalty as a consequence of such failure. Hurd's Rev. Statutes, chap. 8, secs. 62-3-4-5. The evidence merely discloses an honest effort on the part of appellee to comply strictly with the regulations prescribed by the government. It used reasonable efforts to find out the proper oil to use, and the mistake, if it was a mistake, is not attributable to its negligence. It was only required to use the same degree of care and diligence which an ordinarily careful and prudent person would exercise under the same or similar circumstances. When measured by this standard, we think all reasonable minds must agree that the appellee is not guilty of the negligence charged. As the facts bearing upon this question are not controverted, and do not fairly tend to prove negligence on the part of the appellee, the court properly instructed the jury to find a verdict of not guilty. Libby, McNeill & Libby v. Cook, 222 Ill. 209.

The judgment is therefore affirmed.

*Affirmed.*